GEOFFREY A. HANSEN
Acting Federal Public Defender
GABRIELA BISCHOF
Assistant Federal Public Defender
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:     415.436.7700
Facsimile:     415.436.7706
Gabriela_Bischof@fd.org

Counsel for Defendant KOHLMAN

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BRYAN GARCIA BENZON,<br><br>Defendant. | Case No. CR 3:20-cr-00477-JD<br><br>DEFENDANT'S SENTENCING MEMORANDUM |

**INTRODUCTION**

Bryan Garcia Benzon will appear on September 20, 2021, to be sentenced following his guilty plea to one count of possession with intent to distribute heroin resulting from his prosecution as part of the United States Attorney's Office Federal Initiative for the Tenderloin (FIT) campaign, targeting hand-to-hand, street level drug dealing in the Tenderloin.

At the time of his arrest on the federal warrant, Mr. Garcia Benzon was 22-years-old, and had already barely survived a very difficult life. His parents both left Honduras when he was a small child. He was left behind and raised by his grandmother, but by the time he was a teenager, the family was deep in a dispute with the dominant gang over war taxes. He and his brother were forced to flee after

four family members were systematically kidnapped and murdered. After the long journey to the United States, he was separated from his brother and held in disturbing conditions in immigration custody for undocumented minors for a month before being released to his mother. His luck did not improve after he entered the United States, where he was held up at gunpoint, and shortly after discovering that his then-girlfriend was pregnant with his first child, was shot at point blank range in his face because the assailants believed he was a witness to a murder. He suffered significant disabilities as a result of being shot that left him unable to continue his previous physical work. This case arose from his deep desire to provide for his son, and his overwhelming sense that he had no other options. Since his arrest, he has completed significant post-offense rehabilitation: he has completed eleven months on intensive federal pretrial supervision with no violations, reconnected with and received support from his family, and acted as a primary caregiver for his nearly two year old son.

Mr. Garcia Benzon's guidelines are six to 12 months, but in light of his disadvantaged youth, post-offense rehabilitation, the collateral consequences of a term of incarceration in the Bureau of Prisons, and the need to avoid disparities between similarly situated FIT defendants (the vast majority of whom have received time-served sentences), Mr. Garcia Benzon respectfully requests that the Court sentence him to time-served followed by three years of supervised release.

## FACTUAL BACKGROUND

A. <u>Childhood and Flight from Honduras</u>

Bryan Garcia-Benzon was born in 1997 in Honduras. ¶ 38. His father came to the United States to work when he was three months old, and his mother followed when Bryan was three. ¶ 39. As a result, he was raised primarily by his paternal grandmother in Honduras on money his parents sent back from America. *Id.* When he was a teenager, his uncle, Anual Ramon Bengson Pineda, got into a conflict with M-18, a violent gang. ¶ 40; *see also* Declaration of Anual Ramon Bengson Pineda, Exhibit B.  The gang claimed Anual had stolen a car from them, when in fact, he had started to refuse to pay their "taxes." As a result, they began to systematically assassinate his family members. *Id.* In 2011, Bryan's aunts, Marcia (Anual's wife) and Noemi (Anual's sister), and cousin Henry, were kidnapped and ultimately murdered as they left a funeral. *Id.* Because Bryan was so young, he tried to hide out in

Honduras rather than flee. But in 2013, the gang tracked down Bryan's uncle, Johnny, in the family's hometown and murdered him as well. It became clear that the family would be targeted until the gang was out of power or every member of the family was dead. Bryan and his brother Fredy fled within the year. ¶ 41. Even years after they fled, the family members that remained in Honduras were contacted and threatened by M-18.



**In 2014, in DHS custody.**

Bryan arrived to the United States as an unaccompanied minor and asylum seeker. He turned 17 on the long journey over. Because Fredy was over 18, the brothers were separated, and Bryan was placed into immigration detention. ¶ 41. It was a terrifying experience, "worse than jail." The children slept on the floor, shoulder to shoulder, with nothing but thin, mylar emergency blankets. *Id.* They had only the clothes on their backs and he was not given the opportunity to change out of his clothes the entire time he was there. *Id.* When a child would cry, whine, or complain, the guards would turn down the thermostat as punishment. *Id.* The children called the detention center "the icebox." *Id.* After a month, he was released to his mother in Oakland. *Id.*

He reunited with parents he had never lived with and attempted to begin a normal, American life. But living in America was rocky. He was robbed at gunpoint at a BART station shortly after he arrived. ¶ 42. The police were unable to help him and his assailant was never caught. *Id.*

B. March 2019 Shooting and U-Visa Application

On March 19, 2019, Bryan got into the backseat of his friend Victor's car. ¶ 43; *see also* Exhibit D, U-Visa Application/Police Report. His friend Carlos was in the passenger seat. Suddenly, he saw men approach the car and try to open the car doors. Without warning, one of them shot him in the face at point blank range, and shot his friend Victor, the driver, several times in the neck and abdomen. *Id.* The bullet shot through Bryan's cheek, blowing out his teeth and palate, and lodging in his neck. *Id.* After shooting into the car, the men left, but they came back shortly after to see if Bryan and his friends Victor and Carlos were dead. In spite of his serious injuries, Victor managed to drive the car away as they

**In 2019, Highland Hospital.**

approached. *Id.* Bryan lay in the back seat, choking on his own blood. When they reached Highland Hospital, Victor lay down on the ground in front of the hospital. Victor and Bryan were taken into the hospital in critical condition; Carlos had not been hit. *Id.*

Bryan remained in the hospital for over a week and was out of work for months as his injuries healed. ¶ 51. The bullet wound caused occlusion of his left vertebral artery which brings blood to his brain. As a result, the bullet - which ended up coming to a stop in the right side of his neck - had to be left inside his body because doctors were afraid of blocking the remaining accessway of blood to his brain. As a result of bullet damage to his sinuses, he finds it incredibly difficult to breathe when he is ill. At the same time, he was also diagnosed with paraseptal emphysema. See Exhibit C, Medical Records.

Although Bryan was too injured to give a full interview to the detective who arrived at the hospital, he called the police department six times after to report what he had seen and experienced. The Oakland Police Department certified under penalty of perjury that Bryan was the victim of a felonious assault and willing to assist in the investigation or prosecution. Exhibit D at 5. According to Mr. Garcia Benzon's immigration attorney, he applied for a U-Visa but it was never adjudicated because the court denied the fee waiver application he submitted and he could not come up with the money at the time. He will need to resubmit his application. According to a Report to Congress authored by the Director of U.S. Citizenship and Immigration Services, wait times for U visa approval have increased significantly over the last five years. "In the fourth quarter of FY 2020, the median processing time from receipt of a U visa petition until placement on the waiting list was 50.9 months and the processing time from waitlist placement until final adjudication was 10.0 months."[1] If Mr. Garcia-Benzon goes to federal prison, he will be taken into ICE custody. Because he has now been convicted of

[1] https://www.uscis.gov/sites/default/files/document/reports/USCIS-Humanitarian-Petitions.pdf

a controlled substance offense, he will be subject to mandatory detention if he is taken into ICE custody.[2]

Mr. Garcia-Benzon learned he was going to be a father days before he was shot; he survived the incident in part by thinking that he could not die because then he would never meet his child. His son, Liam, was born in October 2019. Mr. Garcia Benzon was 21 years old, with no job, no ability to do physical labor and a middling understanding of English. He had no idea how he would provide for his then-girlfriend and son.

C. <u>Offense Conduct</u>

On May 28, 2020, San Francisco Police Department undercover officers approached Mr. Garcia-Benzon and searched him. ¶ 9. The officers recovered 11.2 gross grams of heroin, 25.4 gross grams of methamphetamine, and 15.2 gross grams of fentanyl. ¶  10. Most of the drugs were packaged in 60 baggies or bindles. *Id.* There were also 47 Xanax pills and seven broken pieces. The officers also found approximately $265 consisting of a variety of denominations. ¶ 9. Mr. Garcia-Benzon admitted possessing heroin with intent to distribute heroin on May 12, 2021. ¶ 2.

He was arrested on four other occasions in 2020 and 2021 for similar conduct. One of those incidents was either not charged or dismissed, three remain pending in state court. ¶¶ 32-34.

D. <u>Performance on Intensive Supervision</u>

Mr. Garcia-Benzon has been out of custody and under location monitoring with U.S. Pretrial Services since October 14, 2020 and has not had any violations. ¶ 4. During this time, he was a primary caregiver for his son. Of his son, he writes: "I struggle to imagine not being able to make him laugh, and to feed, bathe, and put him to sleep. I had never cared for a baby like that before and had never really seen that before because my parents had to leave for the United States shortly when I was very small. I

---

[2]  *See* INA § 236(c)(1)(B), 8 USC § 1226(c)(1)(B).

never thought I would love caring for a baby, but my son made me change in a lot of ways. " Letter from



**With son Liam.**

Bryan Garcia-Benzon, Exhibit A.  Before he was placed on federal supervision, Mr. Garcia-Benzon struggled to deal with the trauma of his life in Honduras and escape to America, as well as the robbery and attempt on his life. In typical teenage fashion (albeit in an atypical situation), he found it difficult to get along with his parents, and bucked their attempts to control him after they left him behind in Honduras for his entire childhood. He lived with friends and his girlfriend for a period, but he moved back in with his parents after being placed on ankle monitor. Moving back in with his parents has provided the stability he needed. He and his parents have mended their relationship and his mother describes him as "loving and respectful" and notes that

he is "remorseful for his actions in the instant offense." ¶ 47.

**ARGUMENT**

The Court is familiar with the directives of *United States v. Book*er, 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a). The Sentencing Guidelines range is not mandatory and the Court has a duty to exercise judgment and discretion in arriving at an appropriate sentence. Importantly, the Court may not presume the Guidelines range is reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam). Instead, the Court must consider the Guidelines range, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6). In crafting a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a), the Court must also consider the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational and vocational

training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

Mr. Garcia-Benzon agrees with the guideline calculation as set forth in the Presentence Report, specifically that his total offense level is 10, criminal history category is I, and the resulting guidelines range is six to 12 months. ¶ 65. Nevertheless, based on his disadvantaged youth and trauma which contributed to his conduct in the instant offense, his post-offense rehabilitation, the collateral consequences of a term of imprisonment, and the need to avoid unwarranted sentence disparities among similarly situated defendants, Mr. Garcia Benzon respectfully requests that the Court sentence him to time-served.

A. The Court Should Vary Downward In Light Of Mr. Garcia-Benzon's Disadvantaged Youth

Mr. Garcia Benzon's personal history and characteristics are factors for the Court to consider in fashioning a fair and just sentence. *See* 18 U.S.C. § 3553(a)(1). Specifically, a defendant's lack of guidance as a youth or disadvantaged background may be mitigating factor which renders him less culpable. See, e.g., *United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991); *Landrigan v. Schriro*, 441 F.3d 638, 648 (9th Cir. 2006). Here, Mr. Garcia Benzon was separated from his parents at a very young age due to poverty, faced the murders of his family and fear for his own life in Honduras, survived an arduous journey to America and incarceration in immigration detention, was held up at gunpoint, was shot in the face and nearly died leaving him with significant disabilities, and became a very young father, all by the time he was 21 years old. It is understandable how someone so young, feeling so overwhelmed, underinformed and hopeless, would turn to selling drugs. He had one thing that motivated him in his life – his son. As he came to grips with his limitations after being shot, he felt as though he had no alternative means to make money. Of course, his circumstances do not erase the poor decisions he made, but they do mitigate his actions and put into perspective his potential for rehabilitation.

B. The Court Should Very Downward Due To Mr. Garcia-Benzon's Post-Offense Rehabilitation

That potential for rehabilitation has been evident over the last year. Since his arrest on the federal case, he has matured and learned from the consequences of his poor decision making. Although he was on extremely strict conditions of release, he completed nearly a year of supervision with no issue. This

*US v. Garcia Benzon,* Case No. CR 3:20-cr-00477-JD;
Sentencing Memorandum.                    7

Court can also consider "post-crime maturation and self-rehabilitation" at sentencing. See *United States v. Ruff*, 535 F.3d 999, 1003 (9th Cir. 2008). The Supreme Court has "made clear that post-sentencing or post-offense rehabilitation—particularly in light of its *tendency to reveal a defendant's likelihood of future criminal conduct*—[is] a critical factor to consider in the imposition of a sentence." *United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013) (citing *Pepper v. United States*, 562 U.S. 476, 491-93 (2011) and *Gall*, 552 U.S. at 59 (emphasis added)). Such rehabilitation is "the most up-to-date picture" of a defendant's history and characteristics, which in turn sheds light on whether a defendant will be deterred from committing another crime. *Pepper*, 562 U.S. at 492 (quoting 18 U.S.C. § 3553(a)(1)). At the time of this offense, Mr. Garcia Benzon was only 22 years old and had distanced himself from his family as he adjusted to life in the United States and his residual injuries after the shooting. His time on location monitoring forced him to be physically close to his family, who are law abiding people and a stabilizing force in his life. He has reconciled with his parents, and spent most of the last year being a full time caregiver for his nearly two year old son. Moreover, Mr. Garcia Benzon's liberty has already been significantly curtailed; he has been on lockdown home confinement for 11 months in the federal case alone and unable to attend family events, see friends, or even complete the mundane errands most people take for granted. The Court should vary downward due to Mr. Garcia Benzon's demonstrated personal growth and his extended time on location monitoring.

C.  The Court Should Vary Downward In Light Of The Collateral Consequences Mr. Garcia-Benzon Faces If He Is Sentenced To The Bureau Of Prisons

The Court should also consider the collateral consequence to Mr. Garcia Benzon if he is sentenced to a term in the Bureau of Prisons. *See United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016) (sentencing a defendant to a one-year term of probation based in large part on the collateral consequences of a drug trafficking offense). Although the Ninth Circuit has held that the threat of deportation is not a basis for a downward *departure*, no such limitation exists on a post-*Booker* downward variance. *United States v. Alvarez-Cardenas*, 902 F.2d 734, 737 (9th Cir.1990); *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir.2006) abrogation on other grounds recognized by *United States v. Munoz–Camarena*, 621 F.3d 967, 969 (9th Cir.2010) (*Booke*r gives district courts "the discretion to weigh a multitude of mitigating and aggravating factors ..."). Some circuits have explicitly

stated that the defendant's deportability may be considered as a variance factor. *See, e.g., United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014) (holding that "a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family").

Here, Mr. Garcia-Benzon has at least one legal claim to status to remain in the United States, that he suffered physical abuse and was helpful to law enforcement in the investigation or prosecution of criminal activity. Ex. D. If he is sentenced to a term in the Bureau of Prisons, he will be turned over to ICE at the end of his term. He will almost certainly be subject to mandatory detention because he has now been convicted of a drug trafficking offense.[3] The median processing time for a U-Visa application is more than five years. *Id.* Thus, if the Court sentences him to a term in the BOP, the collateral consequence will be that he will either need to forfeit a viable claim to status in the United States and be separated from his family indefinitely, or remain in custody for a far, far longer term than even the government is currently seeking. Where, as here, Mr. Garcia-Benzon has demonstrated over the last year that he can be a law-abiding inhabitant of this country, and that he is thoroughly deterred from criminal conduct, there is no reason to impose a sentence with such harsh collateral consequences.

D. <u>The Court Should Vary Downward To Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants</u>

In preparing for sentencing, the Federal Public Defender's Office analyzed the 95 resolved cases that were part of the U.S. Attorney's Office's Federal Initiative for the Tenderloin (FIT) campaign. *See* Bischof Decl. ¶ 7. Of those cases, 64 defendants (67%) received time served, probation, diversion or ATIP. *Id.* For defendants in CHC I, 80% (29 out of 36) received time served, probation, diversion or ATIP. *Id.* Among defendants in CHC I who were in an equal or higher offense level (namely, TOL of 10-14) and thus facing Guidelines of between 6-12 months and up to 15- 21 months, 20 out of 26 such defendants (77%) received time served sentences. *Id.* Out of this group, only one defendant was out of custody at the time of sentencing and he participated in ATIP. In the 19 strictly comparable cases

---

[3] https://www.uscis.gov/sites/default/files/document/reports/USCIS-Humanitarian-Petitions.pdf; *See* INA § 236(c)(1)(B), 8 USC § 1226(c)(1)(B).

*US v. Garcia Benzon,* Case No. CR 3:20-cr-00477-JD;
Sentencing Memorandum.                    9

(defendants in CHC I who at had final offense level 10) 16, or 84%, received probation, diversion, or ATIP. *Id.* None of these defendants were out of custody at the time of sentencing. *Id.*

There were only two white defendants in the entire dataset. They received sentences of 0 days and 1 day. *Id.*

The government's argument that Mr. Garcia Benzon should be sentenced to six months in custody because he has arrests for similar conduct not charged in this case misses several important points. First, the CHC I group includes, not unlike Mr. Garcia Benzon, many defendants who suffered multiple arrests, some of which were not charged. Moreover, three cases arising from Mr. Garcia Benzon's prior arrests are still pending in state court (PSR ¶¶ 32-34), so it would be a mistake to conclude that the federal sentence should include substantial additional time in custody to punish Mr. Garcia Benzon for the allegations made in those cases. Also important to keep in mind is that, unlike some of those other Tenderloin defendants in CHC I, Mr. Garcia Benzon has not suffered a single prior conviction in his life and thus, the collateral consequences of this conviction on his employability and immigration prospects are an entirely new penalty. Finally, unlike all but one of the CHC I defendants, Mr. Garcia Benzon has been out of custody for nearly a year, and has made the most of the opportunity to demonstrate that he does not need a jail sentence to inspire him to turn his life around and that he is not a danger to the community.

The vast majority of similarly situated defendants have received time-served or lower sentences, and Mr. Garcia Benzon, who is young, survived substantial trauma, has a dependent son in need of his care, and has proved himself capable of rehabilitation, should as well.

//

//

//

1

**CONCLUSION**

2   For all the reasons set forth above, Mr. Garcia Benzon respectfully requests that the Court

3 sentence him to time-served, followed by three years of supervised release.

4

5  Dated:  September 6, 2021       Respectfully submitted,

6

7                    GEOFFREY HANSEN
                    Acting Federal Public Defender

8                    Northern District of California

9                      /S
                    GABRIELA BISCHOF

10                  Assistant Federal Public Defender

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28